[No. 3192.]

## T. J. CARTWRIGHT v. THE STATE.

1. EVIDENCE—PRACTICE.—It was proper to permit the State to prove that a few minutes after the deceased and his brother were shot, the defendant and another man were seen at the house of the deceased's father, and also to prove the language and conduct of the defendant at that time and place. The said testimony related to matters which transpired immediately after the shooting, and were closely connected with the shooting, and therefore they were part of the *res gestœ.*

2. CHARGE OF THE COURT—PRINCIPALS IN CRIME—MANSLAUGHTER.—The law of principals in crime applies as well to manslaughter as to any other offense. Though there can be no accomplice in manslaughter, several persons may so act together as to become principals in its commission. It is not, therefore, error to instruct the jury that the defendant might be convicted of manslaughter, although he did not himself inflict the mortal wound.

3. SAME—SELF-DEFENSE.—Upon the subject of self-defense, which was clearly presented by the evidence, the court charged as follows: "The jury are further charged, that if the killing was done in the necessary defense of the slayer, or any of them; that is, to protect himself or themselves from immediate and imminent danger of death or great bodily harm from the violence of the deceased, which was not provoked or sought for by the slayer, and which could not be avoided by any other means except retreating, then it would not be an unlawful killing, but would be justifiable homicide." *Held*, insufficient. In the first place, if the slayer is in immediate and imminent danger of death or serious bodily harm from the violence of the deceased, he is not required to resort to other means than killing his assailant to protect himself, but in such case he is justified in acting promptly and slaying his adversary at once. In the second place, the charge erroneously limits the right of self-defense to actual danger of death or serious bodily harm, whereas the true rule is that if appearances are such as to create in the mind of the slayer a reasonable apprehension of death or serious bodily harm, and he acts under the influence of this apprehension, he acts in self-defense, although there was in fact no danger of his being killed or receiving serious bodily injury.

In the third place, the charge, in view of the evidence in this case, erroneously restricted the right of self-defense to defense against the violence of the deceased alone. See the opinion *in extenso* on the question.

4. Murder—Charge of the Court presented the following instructions to the jury: "In considering the guilt or innocence of the defendant on trial, the jury are instructed that no act on the part of Tom Gill or others would justify or excuse the killing of Mark Gill, unless such other party acted under the advice or under the control of Mark Gill." *Held,* error, inasmuch as it did not require the advice to or control over Tom Gill or others to make the deceased a participant in their acts, and responsible therefor; but if deceased acted together with them, and, knowing their unlawful intent, aided them by acts, or encouraged them by words or gestures in the commission of the violence, or agreed thereto, then he was a principal in the assault upon defendant, and was subject to the same rules as if he was the person who actually committed the assault.

5. Practice—Privilege of Counsel.—Note in the opinion the animadversion of this court upon a gross breach of decorum by the bystanders, and a palpable abuse of the privilege of argument by counsel, and upon the failure of the court to reprimand the same, and to admonish the jury in regard thereto.

Appeal from the District Court of Wise. Tried below before Charles Soward, Esq., Special Judge.

The indictment in this case was joint against the appellant, Bunk Allen and Ed. Johnson, and charged them with the murder of Mack Gill, in Wise county, Texas, on the twenty-third day of December, 1882. The appellant, being alone upon trial, was convicted of manslaughter, and his punishment was affixed at a term of two years in the penitentiary.

The first witness introduced by the State was B. F. Johnson. He testified that he was in the town of Decatur, Wise county, Texas, on the night of December 23, 1882. Between twelve and one o'clock on that night he left the public square with the deceased and Tom Gill, a brother of the deceased, and went with them to the residence of their father, G. W. Gill, to remain all night. Witness, the deceased and Tom Gill went to the room assigned them, and Mack Gill, the deceased, pulled off both his overcoat and dress coat, with the purpose of retiring. At this time Tom Gill proposed to go to the barn and feed his horse. Witness and deceased went with him. They had been at the barn a short time when they saw four or five men coming toward the barn from the direction of a bawdy house that stood some thirty or forty steps west from the barn. These men passed along by the lot gate on the north side of the lot, going

in the direction of a horse that stood a few feet from, and to the right of the said gate, near a corn pen. The deceased and Tom Gill hailed this party and asked them "What in the h—ll they were doing there at that time of night?" The party gave some short reply, and the deceased opened the gate and he, Tom and witness all went out. Some one of the party pushed the deceased back, whereupon the deceased knocked that individual down with his fist. The man raised up and struck the deceased on the right cheek with a rock. Tom Gill then knocked some one of the party down. About this time the party started back toward the bawdy house, the deceased took a position a little farther removed from the gate, and Tom Gill went around the west side of the barn and speedily returned with a gun.

A very few moments later the witness saw the parties leave the bawdy house and start back toward the gate. The party had now been reinforced until it numbered some twelve or fifteen men. Witness stepped back inside the gate and took a position near it. The party rushed up toward the place where Mack and Tom Gill were standing, some of them with pistols drawn, and when they had approached within twelve or fifteen feet of the two Gills they opened fire. The deceased fell at about the second or third shot. Witness then saw Tom Gill stagger as though he was shot, and then saw him turn around, fall to his knees and fire one shot in the direction of the party. Tom then started toward the gate, and witness started to the house. As he was going to the house the witness looked back and saw Tom passing through the inside gate leading from the lot to the house. The party were still firing. Soon after witness reached the house Tom came in and said: "Poor Mack is killed, and I am shot through and can't live." Witness started to go for a doctor, but, seeing two men standing in the street, returned, and Miss Dessie Gill went after the doctor.

The witness did not see either the deceased or Tom Gill with a pistol that day or night. Mack Gill died from the effects of a gun shot wound in the head, inflicted in Wise county, Texas. The deceased did not strike Tom Cartwright, the defendant, nor did he fire a shot, that the witness saw. The deceased was in his shirt sleeves at the time he was shot. The witness was not armed, nor did he fire a shot. The witness made an effort to stop the difficulty when it first began. He said to deceased and Tom Gill: "Boys, you are wrong; it is their horse."

Cross-examined, the witness testified that when the reinforced

party came up from the bawdy house, Tom Gill was standing near the northwest corner of the barn, holding his Winchester rifle in both hands. He held it out, drawn, but the witness could not say that it was presented. As stated, the witness made an effort to stop the first difficulty, saying: "Boys, this is all wrong." Tom and Mack Gill were both under the influence of whisky. Witness did not know how much they had drunk, but they were not to say drunk. The witness did not see the deceased do anything of a belligerant character when the parties returned from the bawdy house the second time. He struck no one that the witness saw. Witness and the two Gills had been to a saloon before the shooting, and from there went to Mr. Gill's house. Witness was in the lot when the shooting began, standing five or six feet from the northeast corner of the barn and about five feet from the gate, which was at the northeast corner of the barn. The witness did not see the man strike the deceased with a rock, but saw the rock lying on the ground and supposed it to be the one with which the deceased was struck. Something was said about a rock.

Tom Gill testified, for the State, that he was the brother of the deceased. He had been with the witness B. F. Johnson and the deceased some three-quarters of an hour prior to the latter's death. They left the square together to go to the house of witness's father, to remain over night. On reaching the sleeping apartment deceased pulled off his coat, preparing to go to bed, when witness proposed to go to the lot to feed his horse, and went, accompanied by deceased and Johnson. While there, four or five men came up to the gate, which is situated at the northeast corner of the barn. A saddled horse stood some six or eight feet to the right of the gate. Some one of witness's party asked the men what they were doing there at that time of night. They replied: "It is none of your d—d business." Thereupon the deceased opened the gate, and he, witness and Johnson passed out, the deceased first, witness next and Johnson last. When the deceased got out, he and some one of the party had some words; deceased knocked that man down, and was, in turn, struck on the cheek by some other member of the party with a stone. The party then left, going toward the bawdy house. The witness went around the barn to the west side, pulled off a plank and secured his gun, telling Johnson to go into the barn. The deceased in the meantime had walked to a point on the outside of the lot some ten or fifteen feet west of the north line from the

northwest corner of the barn. The witness then saw a party coming from the bawdy house toward the party at the barn. The witness was then between Mack and the gate. The bawdy house was a little south of west from the barn. As the party approached, the deceased threw up his hands, and the party fired. The deceased made two or three very high steps backward and fell, shot through the head. Witness did not know who of the party killed him, but saw flashes from five or six pistols. Witness then stepped forward to catch deceased, but received two wounds himself, one through the bowels and one in the thigh. Falling to his knees, he threw a cartridge in his gun and fired one shot. He made an effort to shoot again, but had no cartridge in his gun and his gun lever caught fast. Witness then retreated into the lot, the party continuing to fire upon him until he got into the yard. Witness then went into the house and was not out again for twenty or twenty-five days.

The deceased had a small, single barreled derringer pistol in his vest pocket when he started to go out at the gate at the time of the first difficulty, which the witness took from him and deposited in his own coat pocket. As witness took possession of this pistol the deceased reached for it. When the deceased was killed he was unarmed, so far as the witness knew. At all events he used no arms and shot no weapon. No shots were fired after the witness reached the yard from the lot, on his retreat. Witness heard no words spoken just before the shooting occurred. The efforts of the witness, when the party first came, were directed solely to keeping the peace. He had his gun, holding it down by his side when the party returned, and he fired the one shot only, as described.

Cross-examined, the witness stated that when the party first approached the barn he was uncertain whether or not the horse standing near the gate was his. He thought then that the party was intent on stealing corn for their horses, or perhaps intended to steal horses. Many things kept about the barn had been missed. A bridle had been stolen from the barn a short time before. Witness's family had often been annoyed by parties frequenting the bawdy house. The second party that came from the bawdy house the witness took to be the original crowd with reinforcements, returning to take corn. Witness took possession of the deceased's pistol as the deceased went out at the gate, because he was afraid the deceased would get into a difficulty with the crowd outside. One of the men who came to the

gate claimed the horse as his. Witness, after examination, found that the animal did not belong to him. After the witness was shot, and had got back into the lot, some one of the party ordered him to throw down his gun. Witness replied that the gun was out of fix and would not shoot. Some one of the party then said: "Hold up, boys." The small XL derringer which witness took from the deceased he put in his coat pocket, where, on information furnished by the witness, the coroner's jury found it next morning. The party fired at the witness on his retreat through the lot until the barn intervened, and recommenced firing as soon as he passed the barn and forged in sight, and continued to fire until he got inside the yard. Deceased had no pistol other than the derringer described during the day, that the witness saw.

G. W. Gill, the father of the deceased, was the next witness for the State. He testified that Mack Gill died on the night of December 23, 1882, from the effects of a pistol shot through the forehead. He also had a wound on the cheek. The witness heard some twenty or twenty-five pistol or gun shots discharged between twelve and two o'clock on that night, at which time witness was in bed. Two shots were fired a very short time after Tom Gill got inside of the house. Both of these shots entered the house. About two minutes after Tom Gill entered the house, witness started out at the south door of the east room of his house, and saw the defendant and also another man, whom he did not recognize but who corresponded in size to Bunk Allen, standing in the street, east of the house and near the gate. That street was about twenty steps east of the house. Both the defendant and his companion had pistols in their hands. The defendant was marshal of the town of Decatur, knew the witness, and knew the witness's residence. He also knew the deceased.

The witness's barn stood in the northwest corner of his lot, the north and west sides of the barn forming a part of the lot fence. The distance between the barn and residence, which were separated by a cross fence, was about forty yards. There was a gate in this cross fence, connecting the barn lot and the house yard. The witness had been frequently annoyed by persons frequenting the bawdy house near by, and had complained both to the mayor and the town marshal (the defendant), but had never made affidavit against any one on account of the annoyance. The witness went back into his house when he saw the defend-

ant and his companion standing in the street with drawn pistols. The witness had lost one eye in his youth, and was consequently deficient in eyesight. Two shots went through the west end of the house into the west room.

G. W. Trenchard was the next witness for the State. He testified that at the time of the homicide he was occupying quarters in the house of R. M. Beville, near the residence of G. W. Gill. He heard about twenty or twenty-five shots on the night that the deceased was killed. Witness went over to Gill's residence, and was there informed that Mack Gill had been killed near the lot. Witness went through the lot to the body, reaching it about eight minutes after the shooting. The witness examined the ground about the body for a pistol, but found none. He saw no arms about it, but did not make a very close examination. The witness left the body by the same route he came to it, and shortly returned with Mr. R. M. Beville, and again a search for weapons was unsuccessfully made. Beville turned the body partially over in the search for weapons. The witness did not know who removed the body of the deceased or undressed it. Witness saw Ed. Johnson near the mouth of the street, between the residences of R. M. Beville and G. W. Gill. The witness was city attorney of Decatur at the time of the homicide. The defendant was then town marshal; Bunk Allen was his deputy; William Gilbert was deputy sheriff, and Ed. Johnson was on duty as special policeman. Beville's house stood south of and across an alley from Gill's. The main street was east of Gill's house.

Frank Lovejoy testified, for the State, that he was at the bawdy house on the night of the killing. He saw the defendant, Bunk Allen, Ed. Johnson and others there. About one o'clock that night, Dave Bailey and others came into the bawdy house and told the defendant that some horse thieves had taken possession of his, Bailey's, horse, and had knocked him down. Witness saw blood on Bailey's face. Bailey made a demand on defendant for protection and assistance to recover his horse. The defendant, Bunk Allen, Ed. Johnson, William Gilbert and others went toward Gill's barn together, the witness following them a short distance behind. Witness saw parties at or near the barn, but did not then know them. When the defendant and the parties with him reached the ground, the witness saw the defendant fall down backward, and the shooting began. Witness could not tell who fired the first shot. The deceased

fell at the third or fourth shot. The witness saw the defendant fire one shot at the deceased while he, defendant, was on the ground, and before he got up. Witness saw no pistols before the shooting began. The defendant fell backward, and the witness thought he caught on his left hand. This was before the witness got on the ground. He saw no one strike the defendant. When the deceased fell, the witness jumped over the west string of the fence into the lot, ran down the fence, crossed it again, and returned to the bawdy house. The bawdy house stood about one hundred feet, a little south of west, from the northwest corner of Gill's barn. There was an open space between the barn and the bawdy house, no obstruction intervening.

Mrs. Dena Cates testified, for the State, that she was a sister of the deceased and Tom Gill. She was at her father's house on the night of the killing of the one and the wounding of the other of her brothers. She had been to a performance that night, had but shortly returned, and had not yet retired when the shooting occurred. Two shots entered the west room of the house, after Tom Gill had come in the house. Witness went to the gate with her sister Dessie, when the latter started to get some one to go for a doctor, and when they got to the gate the witness saw two men standing near it in the street, with pistols in their hands. The defendant was one of those men. Witness did not recognize the other. Dessie spoke to the men, told them that one of her brothers had been killed and another wounded, and asked them to get a doctor for the wounded one. The defendant thereupon pointed his pistol at the witness and her sister, and said: "G—d d—n you, go in the house, or I will blow your brains out." Dessie was then in her night clothes. Witness had on her dress but no shoes. The witness had never seen the defendant before that night, and did not know him then. She saw him at the examining trial a few days afterward and recognized him, though she did not point him out. She was not then asked to point him out. Witness did not tell that the defendant was one of the men she saw at the gate until six months after the killing. After Dessie went back into the house the defendant and his companion passed through the gate, up on the porch, and pushed at the door.

Miss Dessie Gill was the next witness for the State. She testified that, after her brother Tom came into the house, wounded, she started to Mr. Beville's to get some one to go for a doctor. When she got to the cross street between her father's and Mr.

Beville's houses, she saw Ed. Johnson coming up the street from the west, with a pistol in his hand. The witness afterward saw Mr. Beville coming from toward Newton's house, and told him to go after a doctor. Witness then went back to the house, and in a few minutes again went out with her sister, Mrs. Dena Cates. They got near the east or front gate, when witness saw two men, each with a pistol in his hand, standing in the street near the gate. Witness did not know these men. One was a very tall man. Witness told them that her brother Mack had been killed and her brother Tom wounded, and asked them to go for a doctor. The men cursed witness and her sister, and told them to go back into the house, which witness and her sister did. Witness could not repeat the language used by the two men. After witness and Dena got back into the house somebody stepped up on the porch, and turned the door knob, but did not enter the house. The tall man at the gate was about the size of the defendant.

Mrs. Gill, the mother of the deceased, testified, for the State, that the deceased had two pistols, one a small black handled single barreled pistol, and the other a white handled five or six shooter. The white handled five or six shooting pistol was in a box in the house at the time of the killing. Witness put it in the box a few days before, and took it out a few days after the killing. At this point the State closed.

W. S. Gilbert was the first witness sworn for the defense. He testified that he remembered the occasion of the killing of Mack Gill. There was a "show" performance in town that night, and a great many people were in town. Witness was then deputy sheriff of Wise county. About ten or eleven that night, at the request of sheriff T. R. Allen, witness went with him to the bawdy house in the north part of town. They went to the bawdy house because they saw a party who had been assaulted there or near there, and considerably bruised up, and because they heard the discharge of fire arms in that neighborhood. Witness and the sheriff found a crowd of ten or fifteen men gathered at the bawdy house. The sheriff and witness remained some time at the bawdy house, and then left. Witness saw Ed. Johnson at the west end of the cross street that runs between the houses of Gill and Beville. Sheriff Allen, Bunk Allen, deputy marshal, and witness passed through the said cross street, turned north and went east of Gill's house, and then turned west and stopped at a corner of the fence a little east of Mr.

31

Gill's house. After standing there some little time, sheriff Allen told witness that he was cold and was going back to town, but for witness and Bunk Allen to remain, and to arrest any party who should discharge a pistol or create other disturbance, or at all events to identify any person or persons who might so offend.

Witness and Bunk Allen remained concealed in the corner of the fence until they got cold, when they went to the bawdy house to warm. City marshal Cartwright, the defendant, was in the bawdy house when witness and Bunk Allen got there. In a short space of time Dave Bailey, the Moore boys and others ran into the bawdy house. Bailey told Cartwright that if he had any officers in the house he wanted him to send them with him for protection; that horse thieves had knocked him down and taken his horse, and he wanted the help of officers to recover his horse. Bailey had blood on his face, nose and hands. Bailey said he would show the officers where to find the horse thieves. The defendant, as city marshal, Ed. Johnson, Bunk Allen and witness started with Bailey. Several others followed. The barn where the assaulting parties were said to be was but a few steps distant from the bawdy house. As the party approached the barn, the witness remarked to them: "Go slow, boys." Defendant was then a little to one side of witness. When near the party, one of them, calling defendant by name, said: "What are you doing here?" At the same time one of them either knocked or shoved the defendant down. Defendant fell backwards to his knees. Just as the defendant fell, some one who stood behind the man who shoved the defendant down fired two shots at defendant. The flashes from these shots were directly toward the defendant. These two shots were fired from a gun.

These shots from the gun were followed by one or two shots from a weapon (a pistol the witness thought) in the hands of the man who knocked the defendant down. They were fired at the defendant. The firing became general on both sides after the first two shots. The defendant fired one shot while he was down, that the witness knew of. He could not say whether the shot he saw defendant fire was fired before or after the deceased fell. Witness did not fire a single shot at the deceased, but did shoot at Tom Gill, after Tom shot at him. After the deceased fell, Tom Gill went into the lot, going through the gate on the north side. Witness went down to the southwest corner of the lot, when Tom Gill, from the inside of the lot, reopened fire on him. Witness fired several shots at Tom Gill from the south-

west corner of the barn. Witness then saw Tom Gill working at the lever of his gun, and called to him to throw down his gun. Tom replied that it was no use; that he was out of cartridges, but would go to the house and get more. Witness then called to the party to desist, and shoot no more. Witness did this because he thought Tom's gun was disabled and he could be readily arrested. The witness did not think that any shots were fired after this. Witness then went up to the body of the dead man and found it to be the body of Mack Gill. Up to this time the witness did not know who the opposing parties were, but supposed them to be horse thieves. Witness then told the parties with him to stay with the body while he went to town to notify the sheriff, and in the meantime to allow no one to touch the body. Bunk Allen went with witness as far as the southwest corner of the square. Witness got the sheriff and returned to the body. Witness saw none of the party with him have their pistols out until the defendant was knocked down.

Sheriff T. R. Allen was the next witness sworn for the defense. He gave the same account of his movements on the night of the killing, so far as they had any connection with the homicide, as that given by the witness Gilbert. He stated, in addition, that when he went to the bawdy house with Gilbert and Bunk Allen, he found the defendant there, who told him that he heard the first shooting at the house, and had come there to see about it. Just as witness left the house, defendant said that it was twelve o'clock, and, as it was Saturday night, he would go up town and close the saloons. When Gilbert called the witness to tell him of the killing, the witness was in bed. When witness got to the body with Gilbert, he found Bunk Allen and Ed. Johnson there. Bunk Allen and witness were not relatives.

James Gose was the next witness qualified for the defense. He testified that he was at the bawdy house at the time of the killing. Dave Bailey, the two Moore boys, and Alex. Bainbridge went out to hunt Bailey's horse. In a short time they returned, saying that horse thieves had knocked Bailey down and taken his horse. Bailey's face was bloody. Defendant, Bunk Allen and Ed. Johnson started out, followed by several others. Witness took up his position on the southeast corner of the house, and saw the parties. When the defendant and his party got to where the other party were, some one of the reputed horse thieves knocked the defendant down with a gun or stick, and fired two shots at him while down. The firing then became gen-

eral.  The witness saw the man who knocked the defendant down, fall.

Joseph Moore was next introduced by the defense.  He testified that from the "show" he went to the bawdy house, near Gill's place.  He went there with Dave Bailey, Jeff. Moore and Alex. Bainbridge.  Bailey missed his horse after being there some little time, and the four parties named went together to hunt for him.  They soon found the horse standing near a fence a little east of Gill's barn.  When the parties stepped up to get him, they saw three parties, one with a gun, standing in the barn lot.  The men cursed the witness's party and asked: "What in the h—ll are you doing here this time of night?"  Witness took hold of the bridle on the horse, when one of them called out: "Shoot the d—d rascal," and rushed out of the yard.  Another of the party in the lot said: "No, boys, you are wrong; it is their horse."  Some one of their party rushed on witness and struck him, then struck Jeff. Moore, and as witness started back to the bawdy house he heard them pommeling Dave Bailey. Witness looked back and saw Bailey coming, and saw blood on his nose.  Witness, Jeff. Moore, Bailey and Bainbridge went on to the bawdy house and told the defendant that some horse thieves had attacked them, knocked Bailey down, and taken his horse; and they demanded the protection and assistance of the officers to recover the horse.

The witness and others followed the officers when they went to the place of assault near the barn.  When the party reached the ground one of the supposed horse thieves struck the defendant an overhanded blow and felled him, and then shot at him, the witness thought with a pistol, though he did not see the weapon.  He, however, did see the flash as it left that man's hand extended toward the defendant.  Witness saw nothing in the hands of the man who knocked the defendant down, and did not know what he knocked defendant down with.  The witness saw another man, who was with the deceased, shoot.  After the first two shots, the firing became general.  Witness thought some six or eight shots were fired before the deceased fell.  After the deceased fell Tom Gill got over the fence into the lot and fired several shots with his gun.  Witness then saw him, Tom Gill, working at the lever of his gun, evidently trying to place in it a cartridge.  Some one of the officers called to him to throw down his gun.  He replied: "It is no use; my gun won't shoot." The officer then called: "Hold up," and the shooting ceased.

The officers' party, including the witness, went back to the bawdy house, and the defendant remained there, going nowhere until sheriff Allen, for whom Gilbert went, arrived. Witness, Jeff. Moore, Bainbridge and Bailey, had all drunk some that night, but were not drunk. They had a quart and a pint bottle of whisky with them. The witness saw none of the officers with drawn pistols until after the defendant was knocked down.

Charles Wallace testified, for the defense, that after the "show" on the night of the killing he saw the deceased take four or five drinks of whisky, and knew him to be under its influence, but could not say that he was drunk. At about ten or eleven o'clock on that night, Frank Hardwicke, John Russell, deceased and witness left the saloon together and went to the bawdy house. After remaining there a short while they left together, to return to the saloon—witness and Russell together in front, Hardwicke and deceased behind. Witness heard a pistol fired behind him, but did not see who fired it. Immediately after it was fired deceased said that he was sorry he fired his pistol, as he was afraid it would involve the party in trouble. Witness saw no pistol. The party went to the saloon, where the witness last saw the deceased about eleven o'clock.

Frank Hardwicke testified that he was with deceased, Russell and Wallace, *en route* from the bawdy house to the saloon, on the occasion spoken of by Wallace, and saw the deceased discharge a pistol. He did not see the pistol, and did not want to. He did see the flash and heard the report. He heard the deceased say that he was sorry he discharged it, as it might result in trouble. Russell testified to the same facts.

Mike Chambliss, for the defense, testified that on the night of the killing, soon after dark, the deceased had a black handled five or six shooting pistol on his person. He handed that pistol to witness, who put it behind the bar in the saloon until deceased should finish a game of pool in which he was engaged. Witness gave it back to deceased when he started to the show. The pistol was too large and too long to be carried in the vest pocket. The deceased took several drinks in the saloon, but was not to say drunk.

C. D. Cates testified that he was one of the coroner's jury that sat in the inquest over the body of deceased. On Sunday morning, the day after the killing, the jury assembled in the room where Tom Gill lay wounded. Tom told some one of the jury

to look in his coat pocket, where a pistol would be found. The pistol was produced from the coat pocket. It was a small single barreled pistol, and showed upon examination that it had not been discharged for several days. The pistol was loaded, and had dust and dirt in the barrel. Witness also saw a Winchester rifle in the room. The lever was hung and would not work.

J. J. Lang testified substantially to the same facts related by the witness Cates, and, in addition, stated that he examined the barn, and found a plank removed from the west end.

Alex. Bainbridge, the last witness examined, gave a detailed account of the tragedy, in substance the same as that given by Joseph Moore.

The motion for new trial presented the various questions involved in the opinion of the court.

*J. A. Carroll*, and *Lovejoy, Dickenson & Patterson*, and *Piner & Smith*, for the appellant.

*J. H. Burts*, Assistant Attorney General, and *W. Poindexter*, for the State.

WILLSON, JUDGE. It was proper to permit the prosecution to prove that, a few minutes after the Gills were shot, the defendant and another man were seen at old man Gill's house, and also to prove the language and conduct of the defendant at that time and place. This testimony, as it is presented in the record, was as to matters which transpired directly after the shooting, and closely connected with it, constituting a part of the *res gestæ* thereof. (Whart. Crim. Ev., sec. 262; *Galbriath* v. *The State*, 41 Texas, 567; *McCall* v. *The State*, 14 Texas Ct. App., 353.)

The law of principals in crime applies as well to manslaughter as to any other offense. There can be no *accomplice* to manslaughter, but several may act together in committing this offense, as in any other homicide. It was not error, therefore, for the court to instruct the jury that the defendant might be convicted of manslaughter, although he did not himself inflict the wound which caused the death of the deceased. (*Ogle* v. *The State*, *ante*, p. 361.)

Upon the issue of self-defense the court charged as follows: "The jury are further charged that if the killing was done in the necessary defense of the slayer or any of them, that is, to

protect himself or themselves from immediate and imminent danger of death or great bodily harm from the violence of the deceased, which was not provoked or sought for by the slayer, and which could not be avoided by any other means except retreating, then it would not be an unlawful killing, but would be justifiable homicide." This was the only charge given upon self-defense. It was excepted to by the defendant at the time as incorrect and insufficient, and the defendant also asked special instructions intended to supply the defects and correct the errors complained of in the court's charge, which requested instructions were refused.

It cannot be questioned that the evidence clearly raised the issue of self-defense. It was therefore essential to a fair and legal trial of the case that the court should fully and correctly instruct the jury upon this issue. This the court failed to do. If the defendant was in immediate and imminent danger of death or great bodily harm from the violence of the deceased, he was not required by law to resort to other means than killing his assailant, to protect himself. In such case the law justifies the assailed party in acting promptly and effectively by at once slaying his adversary. (*Kendall* v. *The State*, 8 Texas Ct. App., 569; *Ainsworth* v. *The State*, Id., 532; *King* v. *The State*, 13 Texas Ct. App., 277.)

Nor does the law limit the right of self-defense, as does this charge, to actual danger of death or serious bodily harm. If the appearances are such as to create in the mind of the slayer a reasonable apprehension of death or serious bodily harm, and he acts under the influence of this apprehension, it is self-defense, although there was in fact no danger of his being killed or of receiving seriously bodily injury. (*Rodrigues* v. *The State*, 8 Texas Ct. App., 129; *Babb* v. *The State*, Id., 173.) "In homicide, and in other cases of violent assault, a danger which is apparently imminent is to be viewed, provided the person assailed honestly believes in its reality and imminency, as if it were actually real and imminent." (Whart. Crim. Ev., sec. 69; Whart. on Hom., sec. 606.)

Again, the right of self-defense, by the charge, is restricted to defense against the *violence of deceased alone.* Under the facts of this case it was error to thus restrict it. There were two other persons present, apparently acting with deceased, one of whom was armed with a gun. If these persons were acting with the deceased in an attack upon the defendant, or if they or either of

them made an attack upon defendant, deceased being present and acting with them in such manner as to make him a principal in such attack, or if the appearances were such as to cause in the mind of the defendant a reasonable belief, and did cause such belief, that the deceased was a party to the attack upon him, or which was about then to be made upon him, by all or either of said persons, then defendant's right of self-defense would extend to the acts of each and all of the party, because the violence of one of them would be that of all. Thus, if Tom Gill violently assaulted defendant, or was in the act of doing so, and the deceased was present aiding in the said assault or encouraging the same; or if the appearances were such as reasonably to cause defendant to believe, and he did so believe, that deceased was participating, or was about to participate, in such attack, then he would have the same right to defend himself against the deceased that he would have to defend against Tom Gill, although deceased may not have used, or attempted to use, any violence upon him.

Another portion of the court's charge is as follows: "In considering the guilt or innocence of the defendant on trial, the jury are instructed that no act on the part of Tom Gill, or others, would justify or excuse the killing of Mack Gill, unless such other party acted under the advice or under the control of Mack Gill." This portion of the charge was excepted to by the defendant, and is manifestly and materially erroneous. If Tom Gill, or others, used unlawful violence against defendant, the deceased being present at the time, and his conduct and the circumstances of the occasion being such as to cause the defendant reasonably to believe, and he did so believe, that the deceased was acting together with Tom Gill or others in committing the violence, then the defendant would be justifiable in defending himself against each and all of the parties he believed, and reasonably had cause to believe, were engaged in assailing him. It did not require the advice to, or control over, Tom Gill or others to make the deceased a participant in their acts and responsible therefor. If he acted together with them, and, knowing their unlawful intent, aided by acts, or encouraged them by words or gestures in the commission of the violence, or agreed thereto, then he was a principal in the assault upon defendant, and subject to the same rules as if he was the person who actually committed the assault. (Penal Code, Arts. 74–78.)

There are other portions of the charge of the court which

in our opinion, are not correct when applied to the evidence in this case, but we shall not take time to specify and discuss them. The objectionable portions of the charge were promptly excepted to by the defendant, and special instructions correcting some of the errors of the main charge were requested by the defendant, and refused. In our opinion the jury was not instructed in the law of the case, and for this reason the judgment must be reversed and the cause remanded.

We are called upon by a bill of exceptions to notice another matter which occurred upon the trial. Upon the conclusion of the argument of the counsel who opened the case on the part of the State, the audience, which was composed of some four hundred people, cheered and applauded the speaker. This was late at night and further argument was postponed until the next morning. The court did not reprimand the audience, or in any way express disapprobation of the improper demonstration, nor was the jury cautioned against suffering this conduct of the audience to influence their minds in the consideration of the case. On the next morning, counsel for defendant were permitted in their addresses to the jury to comment upon and condemn without restriction the occurrence of the night before. In reply to them, counsel for the State, in the concluding argument, alluding to the demonstration made by the audience said, "it was a spontaneous outburst of approval by the audience of this cause, after they had heard it truthfully represented by the State." This remark was not reproved by the court, and still the jury were not admonished by the court to disregard this extraneous matter, and to guard themselves against being influenced by it.

It is unnecessary for us to determine whether or not we would suffer this conviction to stand if this bill of exception presented the only ground of reversal. It is enough for us to say now that we think the court should have taken prompt and decisive action on the occasion, and should have endeavored by its condemnation of the proceeding, and its admonitions to the jury, to prevent any prejudice to the defendant by such reprehensible conduct. And in this effort on the part of the court, counsel for the State should have united. As the matter is presented to us by the bill of exception, we cannot say that the defendant has had a fair and impartial trial upon the law and the evidence of the case.

Because of the errors in the charge of the court, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered June 21, 1884.